Juyoun Han, Esq. (NY 5475314) (Pro Hac Vice Pending)
Eric M. Baum, Esq. (NY 2591618) (Pro Hac Vice Pending)
Andrew Rozynski, Esq. (NY 5054465)
**EISENBERG & BAUM, LLP**
24 Union Square East, Penthouse
New York, NY 10003
212-353-8700 (tel.)
212-353-1708 (fax)
jhan@eandblaw.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

----------------------------------------------------------------

| | |
|---|---|
| JONTE ROBINSON, *individually and on behalf of all others similarly situated*, | No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| FEDERAL BUREAU OF PRISONS, | |
| Defendant. | |

----------------------------------------------------------------

**"The degree of civilization in a society can be judged by entering its prisons."**

– Fyodor Dostoevsky, *House of the Dead.*

**"On average, the COVID-19 mortality rate within prisons is . . . twice as large as the general public mortality rate" and "[t]he rate of COVID-19 cases reported by state and federal prisons in the U.S. is . . . more than four times the rate of confirmed cases per 100,000 U.S. residents."**

– Kevin T. Schnepel, *COVID-19 in U.S. State and Federal Prisons,*
*Council on Crim. Justice (September 2020)*

1

Plaintiff, JONTE ROBINSON, individually and on behalf of all others similarly situated, and through his undersigned counsel, hereby files this Complaint against Defendant Federal Bureau of Prisons, and alleges as follows:

## NATURE OF CLAIM

1.      Jonte Robinson, a person who has served more than eighteen (18) years of his prison sentence for a crime he committed as a teenager, could have been eligible for compassionate release. Instead, because of an outdated medical algorithm that differentiates a Black person's kidney function from non-Black individuals, Jonte remains incarcerated. Jonte remains in prison, knowing —as a medical expert's affidavit reported during his compassionate release hearing— that his risk of dying from COVID-19 is ten times higher than that of an average healthy American adult.

2.      In October 2020, when Jonte submitted an emergency motion for compassionate release, his facility already had 37 active cases of COVID-19. Those suffering from hypertension condition and untreated chronic kidney disease – like Jonte – faced danger of severe or even fatal consequences if they were to contract COVID-19. The Bureau of Prisons ("BOP") and Courts primarily relied on a kidney assessment algorithm called the estimated Glomerular Filtration Rate ("eGFR") score to determine the level of kidney disease that would warrant compassionate release.

3.      At Jonte's compassionate release hearing, the Court called upon BOP staff to inquire whether or not Jonte's eGFR score supports a formal Chronic Kidney Disease ("CKD") diagnosis that would warrant a compassionate release. BOP staff testified that a person's eGFR score dipping below 60 for three consecutive months would support a formal CKD diagnosis.

Jonte's raw eGFR scores[1] in his medical records for the three lab results preceding his hearing were 56, 57, and 58. However, because Jonte is Black, BOP urged the Court to use what is colloquially called the "African American" multiplier ("African-American eGFR Multiplier")[2] which elevated his raw eGFR score by approximately 21% ("African-American eGFR Score"). Applying the African-American eGFR Multiplier, Jonte's raw eGFR scores of 57 and 58 were inflated to 68, and he was deemed to be out of range for a CKD diagnosis. Consequently, Jonte's application for compassionate release was denied.

4.      Jonte's story viscerally illustrates the ongoing systemic inequities in the criminal justice system, caused by inherently racist medical algorithms. The BOP is prohibited, by its own regulation, from discriminating against incarcerated individuals on the basis of their race. 28 C.F.R. § 551.90. As penal authorities, BOP officials owe a duty to provide reasonable care to the prisoners in their protection and safekeeping. *Matthews v. District of Columbia*, 387 A.2d 731, 734 (D.C. Cir. 1978). BOP knew that its clinical standard for diagnosing Kidney Disease was outdated and that medical studies revealed the pseudo-scientific origins of its race-based algorithms. The African-American eGFR Multiplier was developed in the 1990's based on a faulty assumption that <u>Black persons have, on average, greater muscle mass than White persons hence</u>

_____

[1] The term "raw eGFR score" used throughout the Complaint refers to the eGFR calculation that does not factor in the African-American eGFR Multiplier.

[2] This Complaint refers to this formula as the "African-American eGFR Multiplier," which was the colloquialism given to it by the BOP staff. However, its formal, scientific name is the "Modification of Diet in Renal Disease" (MDRD) equation from 1999 to the present, and the "CKD-EPI formula" from pre-2021; *see* "MDRD for Adults (Conventional Units)," National Institute of Diabetes and Digestive and Kidney Diseases (last visited Apr. 18, 2022), https://www.niddk.nih.gov/health-information/professionals/clinical-tools-patient-management/kidney-disease/laboratory-evaluation/glomerular-filtration-rate-calculators/mdrd-adults-conventional-units. To see how the African-American eGFR Multiplier is used on patients, *see* "eGFR using CKD-EPI," Medscape (2020), https://reference.medscape.com/calculator/251/egfr-using-ckd-epi.

different blood creatinine levels, which supports the use of race as a proxy for an artificial multiplier applied exclusively to a Black person's eGFR results. The assumption about muscle mass and race as a proxy for kidney health has been overwhelmingly debunked and rejected by the scientific community.

5.      Studies in medical, scientific literature and patient communities not only exposed the inaccuracies of the outdated African-American eGFR Multiplier, but also pointed out the discriminatory impact the use of such racialized medical algorithms pose. These studies and issues were cited and raised in Jonte's compassionate release hearing. Yet, BOP staff – while recognizing that the BOP's own guidance lags behind the CDC standard and other private clinical standards – still defended the use of the African-American eGFR Multiplier in their testimony: "If we are seeing someone with African-American ancestry, we need to multiply it by 1.2 to get an accurate [e]GFR range."

6.      Jonte's story unfortunately is not unique to his case. The African-American eGFR Multiplier is still widely used in prisons and other medical facilities to test for kidney disease, potentially harming an untold number of other Black patients similar to Jonte Robinson who are the direct victims of systemic racism in the healthcare and criminal justice system. It is also illustrative of race-based disparities in potentially life-saving medical treatments and how Black individuals are deliberately excluded by the system from gaining access to medical care, organ transplantation, and compassionate release opportunities.

7.      This is a class action seeking declaratory and injunctive relief for violations of the Administrative Procedures Act ("APA") for arbitrary and capricious action by a Federal agency, Equal Protection rights guaranteed by the Fifth and Fourteenth Amendments, and the right to be free from cruel and unusual punishment under the Eighth Amendment of the United States

4

Constitution.

8.      As of April 12, 2022, Jonte Robinson has exhausted all available administrative remedies prior to bringing this action.

## BACKGROUND

### *About Jonte Robinson, an Incarcerated Individual Convicted as a Teenager*

9.      Jonte Robinson is a forty (40) year-old incarcerated individual. In 2007, he began serving a 291-month sentence at FCI Hazelton for crimes committed when he was a teenager.

10.      Jonte Robinson suffers from numerous chronic, serious health issues that typically afflict those much older, including hypertension and severe kidney disease. He also suffers from persistent skin rashes that cover his entire body, has not had dental care in over five years, and recent blood work results suggest that he may have or has a high risk of soon developing diabetes and heart disease.

11.      Jonte's life has been full of unfortunate circumstances. Jonte's mother had drug dependency problems and his father was largely absent. Jonte grew up on the streets virtually alone.

12.      When Jonte Robinson was fourteen (14) years old, he – though still a child himself – became a father.

13.      Jonte Robinson was too young to obtain a job at that time, so he turned to what he had seen on the streets as the only viable option to earn money: selling drugs. Jonte Robinson entered the drug trade at age 15.

14.      On the night of August 1, 2000, then 18-year-old Jonte Robinson drove the car that transported his three co-defendants to the apartment where two victims were murdered. Jonte Robinson himself did not possess a firearm nor did he fire any gunshots and he pled guilty to aiding

and abetting the murders. Jonte was sentenced to 25 years in prison and has been serving his sentence ever since.

15.     Having reflected upon his actions for many years, Jonte recently testified at his compassionate release hearing, "there is not one day that goes by that I don't think about the regret and pain I caused the [victim's] families . . . Nothing that I can do or say will bring them back . . . I know loss. Nothing that anyone says will lessen your pain. [But] [p]lease don't allow your pain to continue to punish that boy from 20 years ago, that boy is no longer here."[3]

***Compassionate Release Application based on Chronic Kidney Disease, COVID-19 Risks***

16.     When COVID-19 impacted the world, those incarcerated were especially at-risk. "The COVID-19 case rate in prisons was 5.5 times higher and the age-adjusted death rate was 3 times higher than that of the overall US population."[4]  A Court explained, "individuals in carceral settings are at particularly high risk for contracting the disease because of the inability of individuals to socially distance, shared communal spaces, and limited access to hygiene products."[5]

17.     Because of the heightened risk of severe illness and death caused by COVID-19, incarcerated individuals applied for compassionate release under the First Step Act. The statute requires such individuals to establish "extraordinary and compelling" circumstances to warrant a

---

[3] Robinson Compassionate Release Hrg. Tr. (Feb. 23, 2021), *U.S.A. v. Franklin et al*. No.  04-cr-00128 (D.D.C. March 22, 2021).

[4] Crystal Watson, et al., COVID-19 and the US Criminal Justice System: Evidence for Public Health Measures to Reduce Risk, Johns Hopkins Ctr. for Health Security (2020) at 11, https://www.centerforhealthsecurity.org/our-work/publications/covid-19-and-the-us-criminal-justice-system.

[5] *United States v. Scparta*, 2020 WL 1910481, at *7 (S.D.N.Y. Apr. 19, 2020) (citation omitted).

compassionate release such as a "serious physical or medical condition" that "diminishes the ability of the defendant to provide self-care within the environment of a correctional facility."[6]

18.     In cases where compassionate release was granted, Courts opined that Chronic Kidney Disease ("CKD") increases the risk of severe illness from Coronavirus such that it satisfies the "extraordinary and compelling" standard warranting compassionate release. This was aligned with CDC guidance that "[h]aving chronic kidney disease of <u>any stage</u> increases [an individual's] risk for severe illness from COVID-19."[7]

19.     Jonte suffers from an array of illnesses that include kidney disease and hypertension. A medical expert who reviewed Jonte's medical records concluded that Jonte's risk of dying from COVID-19 is ten (10) times higher than that of the average healthy American.[8]

20.     By that time, the BOP facility where Jonte was serving his sentence was already boasting 37 active cases of COVID-19 among inmates and staff.

21.     On September 14, 2020, Jonte filed a request to the Warden and within the BOP for compassionate release on grounds of a progressive illness or a debilitating injury. On October 7, 2020, the Warden denied this request, noting "your medical provider revealed you do not meet the medical criteria of [being] debilitated."

22.     Jonte then sought compassionate release in the District Court of the District of

---

[6] 18 U.S.C.S. app. § 1B1.13 comment n.1

[7] "People with Certain Medical Conditions," CENTERS FOR DISEASE CONTROL AND PREVENTION (last updated Feb. 25, 2022), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html ("Adults of any age with [cancer or chronic kidney disease] are at increased risk of severe illness from the virus that causes COVID-19.") (emphasis added).

[8] Supp. Br. in Support of Compassionate Release, Decl. W. Weber, ¶ 16, ECF No. 1428-1, *U.S.A. v. Franklin et al.* No.  04-cr-00128 (D.D.C. March 22, 2021).

Columbia, which was ultimately denied by the District Court.

23.     It was during the Compassionate Release hearing at the District Court that Jonte discovered that his kidney disease could not be diagnosed because of what was known as the African-American eGFR Score.[9]

24.     Jonte challenged the legitimacy of the African-American eGFR Multiplier in his brief, [10] but the Court denied his application.

25.     On appeal, Jonte again argued that BOP used a kidney assessment algorithm that makes a Black person's kidneys appear healthier than they are, such that it prevented a formal diagnosis of kidney disease. Jonte challenged that the African-American eGFR Score treats Black individuals differently from any other non-Black population.[11] Jonte's appeal was unsuccessful.

### *Kidney Assessment Algorithm and the African-American eGFR Multiplier*

26.     BOP uses a kidney assessment algorithm (or an equation) called the estimated Glomerular Filtration Rate ("eGFR")[12] which measures serum creatinine in the blood. Some eGFR formulas, including the MDRD formula (1999) and CKD-EPI (2009) equation, take into account the patient's age, sex, and race.[13] In particular, these equations apply a multiplier to the raw GFR

---

[9] *See generally*, March 17, 2021, Hrg. Tr., ECF No. 1425, *U.S.A. v. Franklin et al*. No. 04-cr-00128 (D.D.C. March 17, 2021)

[10] Supp. Br. in Support of Compassionate Release, at 4 n. 3, ECF No. 1428-1, *U.S.A. v. Franklin et al.* No. 04-cr-00128 (D.D.C. March 22, 2021)

[11] Appellant's Br. at 22-24, Doc. No. 1900551, *U.S.A v. Robinson*. Case No. No. 21-3026 (D.C. Cir. May 28, 2021).

[12] Although GFR can be directly assessed by collecting a patient's 24-hour urine sample, such direct assessment remains a cumbersome, specialized, and expensive diagnostic test available only in major medical centers. Hence, in routine practice, GFR is estimated from the blood concentration of serum creatinine, a byproduct of muscle activity which should be removed from one's blood through the work of one's kidneys.

[13] The estimated GFR (eGFR) which is taken through a blood test is preferred over the measured GFR (mGFR) which requires a 24-hour urine collection, which is a cumbersome process for patients.

estimate of a Black person ("African-American eGFR Multiplier"). <u>As a result of the African-American eGFR Multiplier, a Black person's eGFR score is scored several points higher than a non-Black person with the same kidney function, manufacturing the appearance that the Black person's kidney is healthier.</u>

27.     Jonte's lab test results showed that his eGFR scores were 56, 57, and 58 according to the three lab test results preceding his hearing. According to BOP, a person's eGFR scores fall below 60, it supports a formal diagnosis of Chronic Kidney Disease. Hence, Jonte should have been diagnosed with CKD.[14]

28.     However, at Jonte's compassionate release hearing before the District Judge, a BOP medical staff stated on the record that Jonte's raw eGFR score should be inflated because he is Black. The BOP medical staff stated to the court, "you [would] multiply the number [raw eGFR score] by 1.2." Applying this multiplier, BOP staff testified, "[i]f you would multiply [his] most recent GFR of 57 by 1.2, his adjusted GFR is 68. In order to diagnose someone with renal disease, the GFR must be less than 60."[15]

29.     In comparison, other non-Black individuals who had the same raw eGFR levels as Jonte were granted Compassionate Release. *See United States v. Hiller*, No. ELH-18-0389, 2020 U.S. Dist. LEXIS 228122, at *22-23 (D. Md. Dec. 4, 2020) (Defendant who is white had a raw eGFR score of 57 and his Compassionate Release application was granted); *United States v.*

---

[14] In non-BOP clinical settings, a person can be diagnosed with CKD even with eGFR scores higher than 60 depending on other health factors.

[15] March 17, 2021 Hrg. Tr. 8:12-20, ECF No. 1425, *U.S.A. v. Franklin et al*. No. 04-cr-00128 (D.D.C. March 17, 2021)

*Anderson*, No. 99-229(1) ADM/AJB, 2020 U.S. Dist. LEXIS 212002, at *4 (D. Minn. Nov. 13, 2020) (Defendant who is non-Black had a raw eGFR score of 55 and his Compassionate Release Application was granted).

30.    Had Jonte's raw eGFR scores of  56, 57 and 58 been considered by the Courts, he would have most likely been granted compassionate release.

31.    BOP staff explained how a person's eGFR score is the sole and decisive factor for a kidney disease diagnosis: "[a medical diagnosis of renal disease is] solely based [on] a GFR reading, that would be the only way in which — in [Mr. Robinson's] case … that I would [be able to] diagnose him [with renal disease] or even the physician would diagnose him with renal disease."[16]

32.    The BOP staff further testified that it is BOP's standard practice not to diagnose someone with kidney disease unless their eGFR is less than 60: "Typically here [indicating BOP] we don't do it [referring to kidney disease diagnosis] unless that GFR is less than 60 because the treatment is diet and exercise."[17]

33.    Pressed by the District Judge to explain why a multiplier is applied only to Black individuals' eGFR scores, BOP staff testified: "[when] they developed the [e]GFR calculation, they did it primarily on a Caucasian population," and that "[w]hat we've found is [the eGFR test] is not accurate for African-Americans."[18]

_____

[16] March 17, 2021 Hrg. Tr. 8:12-20, ECF No. 1425, U.S.A. v. Franklin et al. No. 04-cr-00128 (D.D.C. March 17, 2021).

[17] March 17, 2021 Hrg. Tr. 16:1-7, ECF No. 1425, *U.S.A. v. Franklin et al*. No. 04-cr-00128 (D.D.C. March 17, 2021).

[18] March 17, 2021 Hrg. Tr. 11:1-4, ECF No. 1425, *U.S.A. v. Franklin et al*. No. 04-cr-00128 (D.D.C. March 17, 2021).

34.     But in fact, this explanation is contradicted by science and exposes deeply problematic assumptions about race.

35.     The African-American eGFR Multiplier was developed under a false assumption that "[B]lack persons have greater muscle mass than white persons."[19] This assumption is not grounded in science or medicine. Instead, it is based on outdated socio-economic factors and social constructs surrounding race that harkens back to the days of slavery.

36.     Because the African-American eGFR Multiplier makes Black individuals' kidneys appear healthier, it can cause a Black person's kidney disease to go undetected. This has many negative clinical consequences, as a Black person may "may not be diagnosed early enough, may not receive intervention at a critical period, and are more likely to progress to higher stages of kidney disease and poor health outcomes."[20] "Because a higher GFR estimate can make Black patients' kidneys appear healthier than non-Black patients', they could be referred to a specialist later, or get prescribed medications at doses that are too high for people with impaired kidney function."[21] Notably, Black individuals face 2–4 times greater age-adjusted risk of progression to end-stage kidney disease, higher rates of premature mortality, and lower likelihood of receiving kidney transplantation.[22]

---

[19] Andrew Levey et al., *"A More Accurate Method to Estimate Glomerular Filtration Rate from Serum Creatinine: A New Prediction Equation. Modification of Diet in Renal Disease Study Group,"* Annals of Internal Medicine 130, no. 6 (March 16, 1999), https://doi.org/10.7326/0003-4819-130- 6-199903160-00002.

[20] Chadha, Lim, Kane & Rowland, *Toward the Abolition of Biological Race in Medicine 25*, Othering and Belonging Institute & Institute for Healing and Justice (May 2020), https://bit.ly/3vs2Xgn.

[21] Kaveh Waddell, *Medical Algorithms Have a Race Problem*, Consumer Reports (Sept. 18, 2020), https://www.consumerreports.org/medical-tests/medical-algorithms-have-a-race-problem.

[22] Mohottige et al., *Racism and Kidney Health: Turning Equity into a Reality*, AJKD Vol. 77-6, pp. 951-

37.     The African-American eGFR Multiplier applied to Jonte's raw eGFR score not only jeopardized his compassionate release application, but also continues to subject him to sub-standard medical care. BOP staff testified at Jonte's compassionate release hearing that medical treatment and care plans would depend on a person's eGFR score. For example, if an individual's eGFR score is low enough, the BOP medical staff would send a note to the physician so he can be added to chronic care clinic. Also, the BOP staff could input diagnosis codes in the chart based on eGFR scores.[23]

38.     Because of the African-American eGFR Multiplier applied to Jonte's raw eGFR score, he did not receive any medical treatment that is necessary to prevent further kidney health decline.

39.     Instead, according to the medical expert who reviewed Jonte's medical records for his compassionate release, BOP's medical staff repeatedly prescribed high doses of ibuprofen, a medication which is toxic to his kidneys and thus "absolutely not safe for renal prescribing," and that this "may have contributed to his declining kidney function over time."[24]

40.     BOP staff's testimony confirms that BOP's policy and clinical guidelines are "a little bit behind on the guidance as far as what you see street wise." BOP uses the Eighth Joint National Committee's definition of Chronic Kidney Disease - which defines Chronic Kidney Disease as having an eGFR below 60 –to determine the risk of severe illness caused by COVID-

---

962, https://www.ajkd.org/article/S0272-6386(21)00437-6/fulltext.

[23] March 17, 2021 Hrg. Tr. 20:22-25& 21:1-9, ECF No. 1425, *U.S.A. v. Franklin et al.* No. 04-cr-00128 (D.D.C. March 17, 2021).

[24] Supp. Br. in Support of Compassionate Release, Decl. W. Weber, ¶¶ 12-13, ECF No. 1428-1, *U.S.A. v. Franklin et al.* No. 04-cr-00128 (D.D.C. March 22, 2021) ("[t]he facility is prescribing [Mr. Robinson] a nephrotoxic medication," ibuprofen, "and the 800mg dose he is prescribed is . . . absolutely not safe for renal prescribing.").

19,[25] even though the updated CDC guidelines[26] at the time stated that Chronic Kidney Disease at all stages can make a person seriously ill from COVID-19. Also, BOP admitted that its policy and clinical guidelines regarding hypertension and blood pressure risk management guidelines are outdated compared to CDC and other clinical guidance.[27]

41.     Incarcerated individuals' lack of access to frequent laboratory testing adds layers to the difficulty to obtain a formal eGFR diagnosis, and further exposes BOP's failure to provide adequate medical care for Jonte and similar individuals. One of the diagnostic requirements for Chronic Kidney Disease is that the eGFR score be under 60 for more than three months.[28] The medical expert reviewing Jonte's medical records noted that Jonte was tested once in October 2020, April 2020, and November 2019. The medical expert opined that the lengthy gaps in testing and the lack of "sufficient [laboratory] data to diagnose" Jonte's kidney condition was indicative of BOP's substandard medical care.

42.     BOP has also been indifferent to co-morbidities that affect Jonte's kidney health and pose heightened risks. For example, Jonte's blood pressure "has not been appropriately monitored."[29] Under "well established national guidelines for managing hypertension," Mr.

---

[25] March 17, 2021 Hrg. Tr. 33:2-10, ECF No. 1425, *U.S.A. v. Franklin et al*. No. 04-cr-00128 (D.D.C. March 17, 2021).

[26] People with Certain Medical Conditions, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html
[27] March 17, 2021 Hrg. Tr. 23:2-20, ECF No. 1425, *U.S.A. v. Franklin et al*. No. 04-cr-00128 (D.D.C. March 17, 2021).

[28] Center for Disease Control and Prevention, National Kidney Month — March 2018. MMWR Morb Mortal Wkly Rep 2018; 67:289, http://dx.doi.org/10.15585/mmwr.mm6710a1external icon ("Chronic kidney disease is defined as damaged kidneys or a glomerular filtration rate (i.e., a measure of kidney function) <60 mL/min/1.73 m2 for more than 3 months.").

[29] Supp. Br. in Support of Compassionate Release, Decl. W. Weber, ¶17, ECF No. 1428-1, *U.S.A. v. Franklin et al.* No. 04-cr-00128 (D.D.C. March 22, 2021).

Robinson needs monthly blood pressure checks and medication modification "until he achieves a healthy blood pressure."[30] Hypertension exerts high blood pressure on the kidneys and is one of the leading causes of kidney disease. BOP's "inability to monitor Mr. Robinson's blood pressure is likely contributing to his kidney disease . . .[and] puts him at a high risk of worsening kidney function as well as other conditions such as heart attack and stroke."[31]

43.     The medical expert further opined: "The facility has provided substandard care based on multiple national guidelines and . . . I am concerned that Mr. Robinson's continued incarceration in the facility puts him at high risk of serious worsening of his medical condition or even death."[32]

44.     All of the issues set forth above reflect continuing problems in BOP policies and practices that are not rectified, and Jonte continues to suffer physical and emotional harm as a result.

## THE PARTIES

45.     Plaintiff Jonte Robinson is currently incarcerated at FCI Hazelton, West Virginia.

46.     Defendant Federal Bureau of Prisons is a United States federal law enforcement agency within the DOJ. BOP was established in 1930 pursuant to Pub. L. No. 71-218. 46 Stat. 325 (May 14, 1930) and is charged with managing and regulating federal penal and correctional

---

[30] Supp. Br. in Support of Compassionate Release, Decl. W. Weber, ¶17, ECF No. 1428-1, *U.S.A. v. Franklin et al.* No. 04-cr-00128 (D.D.C. March 22, 2021).

[31] Supp. Br. in Support of Compassionate Release, Decl. W. Weber, ¶18, ECF No. 1428-1, *U.S.A. v. Franklin et al.* No. 04-cr-00128 (D.D.C. March 22, 2021).

[32] Supp. Br. in Support of Compassionate Release, Decl. W. Weber, ¶19, ECF No. 1428-1, *U.S.A. v. Franklin et al.* No. 04-cr-00128 (D.D.C. March 22, 2021).

institutions. BOP controls and operates FCI Hazelton facility and has immediate custody over Plaintiffs and all other putative class members. BOP is an agency under the Administrative Procedures Act. 5 U.S.C. § 551(1).

## JURISDICTION & VENUE

47.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiff's claims arising under the laws of the United States.

48.     Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. § 2201 and 2202, by 5 U.S.C. § 702, by Federal Rules of Civil Procedure 57 and 65, and by the inherent equitable powers of this Court.

49.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, such as the development and implementation of BOP policies, criminal court hearing upon compassionate release, BOP staff testimonies and decision making  occurred in this District.

## CLASS ALLEGATIONS

50.     Pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2), Jonte Robinson brings this action as a class consisting of all people who are (1) incarcerated within a BOP facility, (2) designated as Black in their medical records, and (3) underwent kidney function assessments which applied the African-American eGFR Multiplier to their raw eGFR score in determining diagnosis, treatment and care plan, and compassionate release. Plaintiff reserves the right to amend the class definition or to establish sub-classes as appropriate if discovery or further investigation reveals that the class should be expanded.

**_Numerosity_**

51.     The class is so numerous that joinder is impracticable. While the precise size of the class is unknown and is constantly changing, Plaintiff believes that roughly 8,400 people currently fit the class definition, although the composition of the class changes daily.[33]

52.     Joinder of these thousands of people is impractical because the number of unnamed, future class members who will be subject to the challenged policy is unknown and unknowable.

53.     Proposed Plaintiff Class members are highly unlikely to file individual suits on their own behalf, given the practical, legal, and monetary difficulties that prevent incarcerated people serving sentences in the BOP from accessing independent counsel.

**_Commonality_**

54.     The claims of the class share common issues of law, including but not limited to whether the challenged policy violates the APA and the Fifth Amendment.

**_Typicality_**

55.     The claims of Plaintiff Jonte Robinson are typical of those of the class as a whole because their criminal history points were assessed under the challenged policy and they would receive lower criminal history points, a lower criminal history score, and lower security point score, if they were scored the same as similarly situated BOP residents who were sentenced by a federal district court.

---

[33] Calculated: 59,375 (total number of Black incarcerated population within BOP) * 1/7 (CKD among U.S. adults) = 8482.14, *See* Inmate Race, FEDERAL BUREAU OF PRISONS,
https://www.bop.gov/about/statistics/statistics_inmate_race.jsp
(Black incarcerated population: 59,375); see also Kidney Disease Statistics for the United States, National Institute of Health, https://www.niddk.nih.gov/health-information/health-statistics/kidney-disease
("Chronic kidney disease (CKD) affects more than 1 in 7 U.S. adults").

*Adequacy*

56.     Plaintiff is an adequate class representative who meets all requirements of Fed. R. Civ. P. 23(a)(4). He has no conflict of interest with other class members and will fairly and adequately protect the interests of the class.

57.     Plaintiff's counsel will vigorously prosecute the interests of the Plaintiff Class, and counsel have experience with the factual and legal issues litigated in this case, as well as with representing plaintiffs in federal civil rights class actions.

58.     Defendant has acted and will act on grounds generally applicable to the class, thereby making final injunctive and declaratory relief appropriate to the class as a whole. This is because Defendant's actions were taken pursuant to a policy and practice of the BOP.  A permanent injunction of the policy will therefore benefit all class members.

**FIRST CLAIM FOR RELIEF**
**ARBITRARY AND CAPRICIOUS ACTION IN VIOLATION OF THE**
**ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 500 ET SEQ.**

59.     Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

60.     The APA requires the "reviewing court" to "hold unlawful and set aside agency action" that is "arbitrary," "capricious," or "an abuse of discretion."  5 U.S.C. § 706(2)(A).

61.     The BOP is an "agency" under the APA. 5 U.S.C. § 551(1).

62.     The BOP's use of the African-American eGFR Multiplier in determining the diagnosis and treatment plan of Black incarcerated individuals, and BOP's application of said race-based algorithm in the process of a compassionate release application, was a final action by the agency who denied the administrative level of compassionate release application upon review of the medical records, and it admitted that the use of the African-American eGFR Multiplier was its

17

standard policy and practice. This caused legal consequences; namely, the deprivation of liberty, unconstitutionally disparate treatment, and other harmful effects on Plaintiff and proposed Class members.

63.     The BOP's use of the African-American eGFR Multiplier violates the APA because it is "contrary to constitutional right"—in this case, the Fifth Amendment's right to equal protection and the Eighth Amendment's right to be free from "unnecessary and wanton infliction of pain."

64.     The BOP 's use of the African-American eGFR Multiplier violates the APA because it is "not in accordance with law"—in this case, the BOP's own regulation that it "shall not discriminate against inmates on the basis of race [in] the making of administrative decisions and providing access to work, housing and programs." 28 C.F.R. § 551.90.

65.     Defendant's policy causes Plaintiffs and proposed class members injuries because it subjects them to unconstitutional and discriminatory treatment, unduly restricts their liberty and reduces opportunities to gain proper medical care, diagnoses, and appropriate treatment on a timely basis, and denies them opportunities for compassionate release.

66.      The challenged policy violates the APA because it is arbitrary and capricious and it therefore must be set aside.

### SECOND CLAIM FOR RELIEF
### VIOLATION OF THE RIGHT TO FAIR AND EQUAL TREATMENT UNDER THE FIFTH AMENDMENT

67.     The Fifth Amendment prohibits the Federal government from treating similarly situated parties differently without rational reason. *See 3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1075 (D.C. Cir. 2003); *Fraternal Order of Police v. United States*, 152 F.3d 998, 1002 (D.C. Cir. 1998) ("Equal protection analysis is substantially identical under the

Fifth Amendment and the Fourteenth."), *reh'g granted on other grounds* , 173 F.3d 898 (D.C. Cir. 1999).

68.     Plaintiff and proposed Class members, who are Black incarcerated individuals, were treated differently than non-Black individuals who had the same raw eGFR score, which resulted in different outcomes reducing the availability of diagnosis and treatment plan of Black incarcerated individuals with kidney disease and limited their ability to seek and obtain compassionate release.

69.     For example, the non-Black defendants who had the same raw eGFR score as Plaintiff Jonte Robinson were diagnosed with Chronic Kidney Disease and the Courts granted compassionate release. *See United States v. Hiller*, No. ELH-18-0389, 2020 U.S. Dist. LEXIS 228122, at *22-23 (D. Md. Dec. 4, 2020) (Defendant who was White had an eGFR score of 57 and his Compassionate Release application was granted); *United States v. Anderson*, No. 99-229(1) ADM/AJB, 2020 U.S. Dist. LEXIS 212002, at *4 (D. Minn. Nov. 13, 2020) (Defendant who is non-Black had eGFR score of 55 and his Compassionate Release Application was granted).

70.     There is no rational basis to treat Plaintiff and proposed class members differently from non-Black individuals by using the artificially inflated African-American eGFR Multiplier in assessing kidney health. The race-based equation forming the African-American eGFR Multiplier harkens back to holdover prejudices and systematically exclusionary practices from the days of slavery and inaccurate assumptions about Black individuals' muscle mass. This inflated eGFR scoring equation has been renounced by the scientific community, the National Kidney Foundation, and numerous hospitals.

71.     Defendant's policy of using the African-American eGFR Multiplier pursuant to what BOP staff described as "standard practice" violates the Fifth Amendment because it treats

similarly situated parties disparately without a rational basis for doing so.

72.     As a direct and proximate result of Defendant's conduct, Plaintiff and the proposed Class have suffered and will continue to suffer harm that is irreparable because the BOP's use of the African-American eGFR Multiplier has far-reaching impacts on the availability of life-saving medical resources, treatment outcomes, debilitating health of kidneys, and timely opportunities to seek compassionate release.

## THIRD CLAIM FOR RELIEF
## VIOLATION OF THE EIGHTH AMENDMENT

73.     The Eighth Amendment guarantees incarcerated persons the right to necessary and adequate medical care, and to be free from cruel and unusual punishment. *See* U.S. Const., amend. VIII. As part of the right, the government cannot subject incarcerated persons to a substantial risk of serious harm to their health and safety. *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

74.     Defendant is responsible for providing adequate and necessary treatment for Jonte Robinson's kidney disease and other health ailments that he suffers.

75.     BOP's failure to provide adequate medical care in response to a worldwide outbreak of a contagious virus because it knowingly uses a false and inaccurate kidney health assessment algorithm constitutes deliberate indifference to the serious, known medical needs of detainees, thereby establishing a violation of the Eighth Amendment of the United States Constitution.

76.     BOP was made aware that the African-American eGFR Multiplier was not grounded in science and renounced by the scientific community, and BOP was also informed that the use of the African-American eGFR Multiplier would constitute race-based discrimination.

20

77.     BOP knew of and disregarded an excessive risk to health and safety that its practice of using the African-American eGFR Multiplier would have on Plaintiff and similarly situated individuals in the Plaintiff Class, including delayed access to medical care, inaccurate prescription of medication, and reduced opportunities for compassionate release. This poses a special risk to many, including Plaintiff and Plaintiff Class, during the time of COVID-19 which is still a grave health risk in many parts of the United States.

78.     BOP failed to act with reasonable care to mitigate these risks and brushed it off as "standard practice."

79.     Because of BOP's unlawful conduct, Plaintiff and the Class are threatened with imminent physical injury, pain and suffering, emotional distress, humiliation, and death.

80.     Plaintiff and the Class have no adequate remedy at law and will suffer irreparable harm unless the court acts immediately to grant the relief requested herein.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE,** Plaintiff respectfully pray that this Court grant the following relief:

a.     Certify the Plaintiff Class as described above in paragraph 50 and appoint the Plaintiff as the Lead Plaintiff and Counsel as Class Counsel.

b.     Declare that the African-American eGFR Multiplier being used for medical treatment decisions, diagnosis, and for the purpose of determining preexisting kidney disease levels for purposes of compassionate release is:

- An arbitrary and capricious action, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706;

- An action not in accordance with the law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706;

- An action not in accordance with the Constitution, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

c.    Grant a preliminary injunction and permanent injunction preventing Defendant from using the African-American eGFR Multiplier in medical treatment decisions, diagnosis, treatment and care plans, work and other assignments, and for determining preexisting kidney disease levels for purposes of compassionate release.

d.    Order Defendant to:

    i.    Reevaluate all BOP decisions that resulted in denials of compassionate release applications from Black incarcerated individuals that were based on the African-American eGFR score and to take appropriate action based on the reevaluations using a race-free kidney assessment formula such as the Cystatin-C.

    ii.    Reevaluate the medical records of Black incarcerated individuals using a race-free kidney assessment formula and provide appropriate medical treatment and care accordingly.

    iii.    Establish a process for notifying all incarcerated persons who may be affected by the BOP's use of the African-American eGFR Multiplier and provide a process for renewing their compassionate release requests with an appropriate standard.

    iv.    Develop guidance and training for all medical staff that work with BOP, including, but not limited to, privately contracted medical facilities, laboratories, and professional staff that work with BOP population to

remove the African-American eGFR Multiplier and replace it with a race-free measurement such as the Cystatin-C.

v.   Order Defendant to create and implement a plan to eradicate healthcare assessment standards, practices, and policies that adversely affect members of the protected class without a medical basis, and establish an oversight mechanism by a qualified health expert agreed upon by parties and/or designated by the Court to oversee the plan and provide training regarding the same to all relevant staff members at BOP.

e.   Award to Plaintiff:

i.   Costs, expenses, and reasonable attorneys' fees pursuant to the Equal Access to Justice Act and any other applicable laws; and

ii.   Any and all other relief that this Court finds necessary and appropriate.

Dated: April 20, 2022

Respectfully submitted,

By:_____/s/_____
    Juyoun Han (Pro Hac Vice pending)

By:_____/s/_____
    Eric M. Baum, Esq. (Pro Hac Vice pending)

By:_____/s/_____
    Andrew Rozynski, Esq.

**EISENBERG & BAUM, LLP**
24 Union Square East, Penthouse
New York, NY 10003
212-353-8700 (tel.)
212-353-1708 (fax)
*Attorneys for Plaintiff*
jhan@eandblaw.com

23